## Case No. 7,286.

### The JENNY JONES.

[Deady. 82.] [1]

District Court, D. Oregon. July 11, 1864.

David Logan, for libellants.
Lafayette Grover, for claimant.

DEADY, District Judge. Janion, Green and Rhodes, of Victoria, bring this suit to recover the value of certain goods shipped by them on the schooner Jenny Jones, from Victoria to Portland, and not delivered. The libel was filed July 6, 1864. The respondent and claimant, James Jones, appeared and answered the libel on July 7, and by consent of parties, the cause was set for trial at once. By the pleadings it is admitted, that the schooner. on May 10, 1864— the claimant being both owner and master— sailed from Victoria for Portland, having on board two hundred mats of sugar and ten hogsheads of ale belonging to the libellants, to be delivered to their consignees, Ladd, Reed & Co., at the latter port; that the claimant signed the usual bills of lading, and was to receive certain freight and primage for the carriage of the goods; and that the goods were never delivered. As an excuse for the non-delivery of the goods, the

[1] [Reported by Hon. William Cranch, Chief Judge.]

[1] [Reported by Hon. Matthew P. Deady, District Judge, and here reprinted by permission.]

claimant pleads in his answer, "that on May 14, 1864, said schooner being properly in the pursuit of her voyage, by the dangers and perils of the sea, stress of weather and the unavoidable causes of accident connected therewith, and without negligence of the respondent, was thrown upon the shoals and a sand spit at the entrance of the Columbia river, * * * in the midst of the breakers therein, and then was momentarily in danger of total wreck of said schooner, and loss of all her cargo, and the crew and passengers," and that to save the vessel, crew and passengers, the claimant then and there caused the goods of the libellant, together with other goods on board, to be thrown overboard. The answer also denies negligence, and that the goods were of the value alleged in the libel—$858.70. On the trial it was admitted that on the day of the wreck, May 14, the pilot boat of the Columbia river bar, was inside the bar, and that the pilot thereon saw the schooner approaching, and would have gone out to her, but the wind would not permit; and, also, that the goods were of the value alleged in the libel. The bills of lading were produced and contained the clause: "the dangers of the sea only excepted." A number of witnesses have been examined, including the claimant, and one of the crew of the schooner—Richard Downie—touching the propriety of the schooner's attempting to cross the bar when she did without a bar pilot, and the necessity of the jettison.

On the argument, it was practically admitted by counsel for libellants, that after the schooner struck or grounded, it was necessary to throw over the cargo to get her off and save the lives of the passengers and crew. The schooner was heavily laden with pig iron, the goods of the libellants were stowed on top, and it was necessary to throw out most of the cargo, to lighten the vessel over the sand spit on which she grounded. The right to recover turns upon the question of whether the schooner was properly navigated in crossing the bar as she did. The evidence bearing upon the question, establishes the following facts: That the Jenny Jones, with assorted cargo and twenty passengers, after a voyage of three days from Victoria, made the offing near the mouth of the Columbia river, about seven o'clock p. m. of May 13; that the pilot boat was inside of Baker's Bay, but could not be seen from the schooner; that there was a smart northwest breeze outside, and the vessel was in good condition and well provided, so far as appears: that the schooner stood off the mouth of the river until half-past four o'clock in the morning, when she stood in for the bar with a fresh breeze from the northwest, where she arrived about six o'clock, and sailed in the north channel, having about twenty minutes before set a signal for a pilot, without, however, delaying on that account; that about a mile inside the bar and near Cape Disappointment, it is necessary to haul to the northward, and at this point the wind died away, and the schooner met the ebb tide with very heavy rollers, two or three of which struck her on the port bow, and drove her over on Sulphur Spit, on the south side of the channel; that finding the schooner going on to the spit sideways, the sailing-master, Spenser, turned her head on, in the hope of being able to drive her across it into the south channel, but the water was too shallow, and the schooner grounded at about half-past seven o'clock; that about seven o'clock p. m. of the same day, after throwing over about two thirds of the cargo, the vessel with the flood tide and a fresh breeze, got over the spit into the south channel, and reached Astoria that evening, leaking and considerably damaged. That from the nautical almanac it appears that on May 14, flood tide on the bar would commence about one o'clock a. m. and run for six hours, and again about one o'clock p. m. and run for same time; that, in fact, the duration of the flood tide on the Columbia river bar is governed by the stage of the water in the river, and the strength and duration of the northeast winds, and that sometimes owing to these causes the flood tide is scarcely perceptible; that during some weeks in the months of May and June, owing to the melting of the snow in the mountains, there is always high water in the Columbia river, and a strong current outward at the mouth; that this year the rise in the Columbia came early, and was stronger than usual at the time the schooner came in, and for that reason the flood tide did not run more than four or five hours on the morning of May 14; that although a northwest wind is a fair one for a vessel bound in, yet in the morning, in the spring season, it often dies away near Cape Disappointment, and then you meet a northeast wind inside; but in the afternoon a vessel is most likely to carry the northwest wind to Astoria, several miles above Sulphur Spit, at which point the dangers of the navigation cease, and not before; that the claimant is not an experienced seaman, and has but little knowledge of the Columbia river bar, but that he relied upon Spenser, his sailing-master, who had taken the schooner out over the bar in April previous, and about a year before had taken some small craft in and out a few times; and that several persons of more or less experience in crossing the bar, testified on the trial, that under the circumstances they would have done as the claimant did, and attempted to bring the schooner in without a pilot.

Upon these facts the question arises, was the jettison the result of unavoidable accident, or may it fairly be attributed to the want of skill and prudence in the navigation of the vessel? The contract and business of the claimant was that of a common carrier, and the law wisely imposes upon him the duty of using all reasonable skill and prudence in the performance of his undertak-

ing. The clause in the bill of lading—"the dangers of the sea only excepted," does not limit the liability of the carrier. The law, in exempting a common carrier from responsibility for unavoidable accidents, silently attaches such a clause to all contracts for the carriage of goods for hire. But if the loss is directly attributable to human agency, then it is not caused by unavoidable accident, whatever may be the immediate cause of such loss. For instance, although it be admitted that the loss of the goods was unavoidable at the moment they were thrown over, yet if the goods were placed in this peril and necessity by the want of ordinary diligence—reasonable skill and prudence—in navigating the schooner under the circumstances, the loss is directly attributable to human agency, and the carrier is liable. Story, Bailm. § 512. Was the master justifiable in coming in without a bar pilot? As far as the pilot is concerned, he had a legal right to do so, but so far as shippers are concerned, if he omitted to take a pilot, except under circumstances of imperative necessity, he took the risk of all accidents which are attributable to that cause. Under such circumstances the master, owner and vessel are liable to the shipper for any injury resulting from a want of that knowledge which might have been obtained by the employment of a pilot concerning the condition of the tides, currents, winds, shoals, or other matters affecting the navigation of the river. There was no imperative necessity for bringing the schooner in without a pilot. Taking half tide as the proper time to come in, so far as the tide is concerned, the schooner should not have attempted to come in before four o'clock a. m., May 14. This was about daylight when the schooner was yet some distance at sea. But for another reason it was not proper to attempt an entrance until the afternoon of that day, because in the morning, a vessel was liable to lose the wind behind Cape Disappointment, and at the same time meet a strong ebb tide by reason of the unusual current in the river. I do not think the master ought to have expected a pilot to take him in before the floodtide in the afternoon of May 14, as that was really the first time it could be safely undertaken after the schooner reached the bar. It appears that it is not unusual for a vessel to lay off the mouth two or three days for a pilot. If there was a steam tug on the bar, as there ought to be, there would be no necessity for delay in piloting in a vessel, except in rare instances.

Counsel for claimant maintain that Spenser is shown to have been a competent pilot, although not a licensed one, and that is sufficient. The evidence upon this point does not satisfy me of that fact. The master testifies that he signaled for a pilot twenty minutes before he went in, and unless this was intended at the time as a mere make-believe, it indicates pretty plainly that he thought he needed one. Spenser may have been as able, with the assistance of a chart, to follow the channel, as any one. But he does not appear to have been acquainted with the local causes that affected the flow of the tide, or the peculiarities of the wind at certain seasons of the year and times of day, and upon knowledge of these, and the like, depends, in a great measure, the competency of a bar pilot. But admitting that Spenser was competent to navigate the schooner on the occasion, with reasonable skill and prudence, did he do so? I think not. He was probably ignorant of the impropriety of attempting to cross the bar on the last of a flood tide, because he was unaware of the unusually strong current in the river, and the prevalence of the northeast wind on the inside. But all these facts were known to the local pilots, and if the master had availed himself of this knowledge by the employment of one of these, as he was bound to, the loss, so far as can be seen, would not have occurred. Upon the concurrent testimony of the witnesses as to the usual condition of the tides, current and winds, at that season, it appears quite probable that the vessel came in at an improper time of the day and stage of the tide, and the result of the experiment proves such to have been the fact. The freshet in the Columbia was earlier than usual this year—a fact of which Spenser appears to have been ignorant. Had this been otherwise the flood tide might have lasted until the schooner reached Astoria, and thus carried her by the spit after she lost the northwest wind. I find that the jettison of the libellant's goods, although unavoidable at the time, was nevertheless the direct consequence of the conduct of the master, in entering the river at an improper time of tide and wind, which might have been avoided by waiting a reasonable time for a qualified pilot, and that therefore the claimant and schooner are both liable to the libellants for the value of the goods with legal interest from the time they should have been delivered—say May 20, 1864.

It will be observed, that in coming to this conclusion, I have not given much heed to the testimony of certain witnesses, who declared that if they had been in command of the schooner, under the circumstances, they would have brought her in without waiting for a pilot. They might have done so, and doubtless think they would, but if they had, and a similar loss of cargo had been the consequence, they would have been liable for it. The law imposes a certain obligation upon a common carrier. He must use ordinary diligence to avail himself of the knowledge and means necessary to transport safely the goods bailed to him. Whatever these witnesses may think or say they would have done under like circumstances, it is manifest to my mind that the risk incurred in bringing the schooner in when she was without a competent pilot, was unnecessary, and betrayed a reckless disregard of duty or a want of rea-

sonable skill and knowledge on the part of the claimant. Decree, that the libellant recover the sum of $858.70, with legal interest from May 20, 1864, with costs.